IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Edward W. Nottingham**

Civil Action No. 04–cv–02536–EWN


VICTORIA KATCHEN,

      Plaintiff,

v.

JO ANNE B. BARNHART,
Commissioner of Social Security,

      Defendant.

_____

**ORDER AND MEMORANDUM OF DECISION**
_____

      This is a social security benefits appeal under 42 U.S.C. § 405(g) (2005).  Plaintiff

Victoria Katchen challenges the final decision of the Commissioner of Social Security (the

"Commissioner") denying her application for disability insurance benefits.  Jurisdiction is based on

42 U.S.C. § 405(g).

**FACTS**

*1.*    *Medical Evidence*

      Plaintiff was born on April 5, 1957, and was forty-four years old on the onset date of her

disability.  (Admin. R. at 45 [filed Feb. 10, 2005] [hereinafter "Admin. R."].)  Plaintiff graduated

from high school, attended trade school to become a machinist, and obtained an associate degree

in graphic design.  (*Id.* at 75, 197.)  Plaintiff has worked in the vocationally relevant past as a

machinist, laminating machine operator, and graphic arts designer.  (*Id.* at 78–80, 200–02.)

Plaintiff last engaged in work qualifying as substantial gainful activity in 1999.  (*Id.* at 70, 194.)

From 2002 until at least the time of her hearing in February 2004, Plaintiff worked part time as an

exercise instructor, but this work does not qualify as substantial gainful activity.  (*Id.* at 22,

198–99.)  Plaintiff alleges that she became unable to work beginning on May 21, 2001 due to

chronic back pain caused by a back injury, right sacroiliac joint dysfunction, and arthritis.[1]  (*Id.* at

69.)

Plaintiff's first relevant medical records on file date from September 30, 2002 and January

14, 2003, when Plaintiff visited the Salud Family Medical Center ("Salud") with complaints of

sciatic pain and allergic reactions to her medication.  (*Id.* at 135–36.)  Doctors at Salud readjusted

Plaintiff's medications.  (*Id.*)  On January 30, 2003, Plaintiff returned to Salud and visited Claudia

Calabrese, O.D. with complaints of allergic reactions to medication, difficulty sleeping, fatigue,

and pain in her upper back and elbows.  (*Id.* at 134.)  Upon examination, Dr. Calabrese found that

Plaintiff: (1) had good active range of motion of the lumbar spine; (2) experienced pain with

extension and flexion, with greater pain upon extension than upon flexion; (3) experienced right

low back pain and gluteal pain, but no leg pain, with straight leg raising; and (4) experienced

tenderness over the right sacroiliac joint, at L5/S1, and along the right piriformis.  (*Id.*)

On February 5, 2003, Peter L. Weingarten, M.D. performed a consultative examination of

Plaintiff.  (*Id.* at 124–25.)  Dr. Weingarten did not have access to Plaintiff's medical records, and

---

[1]Plaintiff initially alleged an onset date of December 31, 1999, which she amended to May
7, 2001.  (Admin. R. at 45, 194.)  The administrative law judge's decision reflects an onset date
of May 17, 2001.  I deem this ten-day difference to be harmless error.  *See Glass v. Shalala*, 43
F.3d 1392, 1396–97 (10th Cir. 1994).

based his findings on his examination and Plaintiff's statements. (*Id.*) Dr. Weingarten noted

Plaintiff's statements that she: (1) was injured at work in 1995; (2) injured her sacroiliac joint,

more severely on the right side than on the left; (3) experienced persistent, severe back pain in the

lumbar region, with pain radiating into the right leg and right upper back; (4) experienced

especially severe pain with prolonged sitting; and (5) was unable to bend or twist because of the

pain. (*Id.* at 124.) Upon examination, Dr. Weingarten found that Plaintiff appeared healthy and

ambulated about the office with ease, but moved in a guarded fashion because of apparent

discomfort. (*Id.*) Dr. Weingarten found that Plaintiff's lumbar range of motion revealed forward

flexion forty degrees, hyperextension ten degrees, lateral tilts ten degrees, and lateral twists ten

degrees. (*Id.* at 124–25.) Plaintiff's straight leg raising was "full and free." (*Id.* at 125.) X-rays

of Plaintiff's lumbar spine, including the pelvis and sacroiliac areas, revealed minimal degenerative

changes. (*Id.*) Dr. Weingarten opined that Plaintiff was capable of intermittent sitting and

standing for one hour at a time and lifting, carrying, and handling objects weighing up to ten

pounds. (*Id.*)

On February 27, 2003, Plaintiff presented to Dr. Calabrese for a follow-up appointment at

Salud. (*Id.* at 131–32.) Dr. Calabrese's examination of Plaintiff revealed multiple tender points

consistent with fibromyalgia.[2] (*Id.*) X-rays of Plaintiff's lumbar spine were normal. (*Id.*) Dr.

Calabrese diagnosed Plaintiff with chronic low back pain with suspected fibromyalgia. (*Id.* at

132.)

---

[2] Fibromyalgia is a nonarticular rheumatic disease characterized by dull and persistent pain, tenderness, and stiffness of muscles, regions where tendons are inserted into bones, and nearby soft tissues. These symptoms can be due to overuse of muscles or be secondary to another, underlying disorder. 2-F Attorneys' Dictionary of Medicine 1790 (Matthew Bender 2005).

On March 27, 2003, Plaintiff presented to Dr. Calabrese for another follow-up appointment. (*Id.* at 129.) Dr. Calabrese noted Plaintiff's complaints of depression and unpleasant reactions to medications. (*Id.*) Dr. Calabrese reviewed medical records from Plaintiff's 1995 injury, including a magnetic resonance imaging ("MRI") scan that was "completely normal by report." (*Id.*) Dr. Calabrese diagnosed Plaintiff with chronic back pain with probable fibromyalgia and depression related to the pain. (*Id.*)

On April 3, 2003, Plaintiff presented to Dr. Calabrese complaining of swelling around her eyes and knee pain resulting from a fall. (*Id.* at 127.) Dr. Calabrese found that Plaintiff's ligaments around the knee, except the medial collateral ligament ("MCL"), were stable and without tenderness. (*Id.*) Dr. Calabrese diagnosed Plaintiff with periorbital swelling of uncertain etiology, an abrasion of the left knee, and a sprain of the MCL in the right knee. (*Id.* at 128.)

On June 6, 2003, Dr. Calabrese completed a physical residual functional capacity ("RFC") questionnaire. (*Id.* at 152–57.) Dr. Calabrese reported that she had treated Plaintiff on a monthly basis since January 30, 2003 for chronic low back pain and fibromyalgia. (*Id.* at 153.) Dr. Calabrese opined that Plaintiff could: (1) rarely twist, stoop, and bend; (2) lift ten pounds frequently and twenty pounds occasionally; and (3) sit for five minutes and stand for ten minutes at a time. (*Id.* at 154–55.) Dr. Calabrese also opined that Plaintiff would need to shift positions at will and take unscheduled breaks. (*Id.* at 155.) Dr. Calabrese stated that Plaintiff's pain frequently interfered with Plaintiff's attention and concentration. (*Id.* at 156.)

On June 19, 2003, Plaintiff presented to Dr. Calabrese with the complaint that her sprained right knee had not improved. (*Id.* at 142.) Upon examination, Dr. Calabrese found no effusion of the right knee, but found that Plaintiff had tenderness over the medial joint line and

over the MCL. (*Id.*) Dr. Calabrese recommended an MRI of Plaintiff's right knee. (*Id.*) On June 24, 2003, an MRI revealed: (1) an abnormal fluid collection associated with the MCL, "predominantly located deep to the MCL;" (2) a small amount of edema, "both deep and superficial to the MCL;" (3) chondromalacia involving the lateral tibial plateau and the lateral patellar facet; and (4) an osseus lesion of the proximal fibula.[3] (*Id.* at 143–44.)

On November 17, 2003, Frederick G. Leidal, Psy. D. performed a consultative examination of Plaintiff. (*Id.* at 146–50.) Dr. Leidal noted that Plaintiff reported a daily routine of "fairly normal activities," including taking care of personal hygiene needs, cooking, cleaning, and running errands. (*Id.* at 147.) Dr. Leidal noted that Plaintiff taught an exercise class twice a week, and transportation was "not a significant problem" because Plaintiff could drive. (*Id.*) Plaintiff told Dr. Leidal that she walked if she could, and that sitting caused pain. (*Id.*) Dr. Leidal reported that Plaintiff had normal posture and a normal, unencumbered gait. (*Id.*) Dr. Leidal found that: (1) Plaintiff's affect during the examination was normal, and appeared "mood congruent;" (2) Plaintiff was able to attend to questions during the examination and was not markedly distracted or impaired; (3) Plaintiff's general ability to communicate was unremarkable; and (4) Plaintiff's ability to understand and comprehend simple language "appeared good, " but Plaintiff's ability to understand more complex directions and language was "fair to below average." (*Id.*) Dr. Leidal noted that Plaintiff's judgment for confronting simple circumstances, ability to solve problems, insight, and impulse control all appeared fair. (*Id.* at 148–49.) Dr. Leidal opined that: (1) Plaintiff's intelligence level was low average; (2) Plaintiff had a depressive

---

[3]Chondromalacia is an abnormal softening of cartilage. 2-CH-CZ Attorneys' Dictionary of Medicine 1178 (Matthew Bender 2005).

disorder; and (3) Plaintiff had a global assessment of functioning ("GAF") level of sixty, "based on severity of symptoms as [Plaintiff] reports moderate symptoms of depression that appear to be related to her medical condition." (*Id.* at 149.) Dr. Leidal concluded that: (1) Plaintiff's ability to relate to the public, including co-workers and supervisors, was not impaired, but Plaintiff's abilities to accept instruction or criticism and respond appropriately to others in a work setting were slightly impaired; (2) Plaintiff's abilities to maintain attention to simple work-related tasks and carry out a simple repetitive task were not impaired, but Plaintiff's ability to recall tasks was slightly impaired; (3) Plaintiff's abilities to follow short, simple instructions and understand and carry out more detailed instructions were not impaired, but Plaintiff's ability to comprehend and carry out more complex levels of instruction and direction was moderately impaired; and (4) from a psychological perspective, Plaintiff's ability to obtain "some kind of productive employment" was not impaired, but Plaintiff's abilities to maintain employment, adapt to the work environment, tolerate work-related stressors, and complete a normal work day were impaired. (*Id.* at 149–50.)

On December 30, 2003, Plaintiff visited Dr. Calabrese and complained that she was "hurting all over," primarily in her right upper extremity and right and lower back. (*Id.* at 163–64.) Plaintiff reported that she continued to teach exercise classes and performed Pilates exercises at home. (*Id.* at 164.) Upon examination: (1) Plaintiff's wrist was free of effusion and erythmea; (2) Plaintiff experienced no tenderness to palpation and no pain with resisted motion of the wrist or of the fingers; (3) Plaintiff had a full active range of motion of the cervical spine without pain; and (4) Plaintiff had tenderness and tightness over the right levator and in several areas throughout the right trapezius, rhomboid, and scalenes. (*Id.* at 163, 164.) Dr. Calabrese

opined that Plaintiff's pain was related to her fibromyalgia, and noted that Plaintiff also suffered from chronic pain and depression.  (*Id.* at 163.)

On January 27, 2004, Plaintiff presented to Dr. Calabrese complaining of increased pain. (*Id.* at 167.)  Plaintiff reported that she had stopped taking her medications because of the negative side effects.  (*Id.*)  Dr. Calabrese opined that Plaintiff's pain was substantially interfering with Plaintiff's life and contributing to Plaintiff's depression, and recommended a low dose of MS Contin "to pursue improved pain control."  (*Id.* at 167–68.)

## 2.    *Procedural History*

On October 7, 2002, Plaintiff filed an application for disability insurance benefits.  (*Id.* at 45.)  On February 7, 2003, the Social Security Administration denied Plaintiff's application.  (*Id.* at 41.)  On February 20, 2003, Plaintiff requested a hearing before an administrative law judge ("ALJ").  (*Id.* at 38.)  On February 11, 2004, the ALJ held a hearing, at which Plaintiff and vocational expert ("VE") Anthony Manuele testified.  (*Id.* at 189–237.)

Plaintiff testified that she could: (1) sit for fifteen to thirty minutes; (2) stand for fifteen to twenty minutes; (3) walk about one-half mile; and (4) lift fifteen to twenty pounds.  (*Id.* at 205–07.)  Plaintiff testified that she took medications including vicodin and morphine that made her nauseous, but did not alleviate her constant pain.  (*Id.* at 208–09.)  Plaintiff stated that she was allergic to most of the medications she had taken in the past.  (*Id.* at 209.)

Plaintiff testified that she had been teaching three or four water aerobics classes per week for approximately two years and had recently started performing Pilates exercises at home, after attending Pilates classes for four months.  (*Id.* at 198–99, 211–12.)  Plaintiff testified that she had driven to the hearing without stopping.  (*Id.* at 205.)  Plaintiff stated that the drive was one and

one-half to two hours long, and the drive had exacerbated her back pain. (*Id.* at 205, 207.)
Plaintiff testified that she regularly drove approximately thirty minutes to and from the water
aerobics classes she taught. (*Id.* at 207.) Plaintiff stated that she cooked, did housework, did her
laundry, and shopped for groceries on her own. (*Id.* at 215–16.) Plaintiff testified that her adult
sons assisted her with whatever she needed done around the house. (*Id.* at 222.) Plaintiff
testified that she slept between two and four hours a night, was awakened by her pain often, and
napped three or four times per day. (*Id.* at 218.)

The VE testified regarding his review of Plaintiff's vocational history on file. (*Id.* at
223–37.) The VE stated that Plaintiff's past work: (1) as a machinist was a skilled position,
requiring a heavy exertion level as Plaintiff performed it; (2) as a graphic designer was a skilled
position, requiring a sedentary exertion level; and (3) as a laminating machine operator was a
skilled position, requiring a heavy exertion level as Plaintiff performed it. (*Id.* at 224.)

The ALJ then proposed a series of hypothetical situations, upon which the VE opined.
(*Id.* at 226–33.) First, the VE testified that an individual similarly situated to Plaintiff — an
individual of the same age and educational background as Plaintiff, and restricted to lifting twenty
pounds occasionally and ten pounds frequently; standing, walking, and sitting for one hour at a
time up to four hours in an eight-hour day, with the opportunity to stretch and rest after standing,
walking, or sitting for thirty minutes; taking regular breaks approximately every two hours in an
eight-hour day; occasionally climbing ramps and stairs, balancing, stooping, kneeling, crouching,
and crawling; occasionally driving; avoiding climbing ladders, ropes, and scaffolding; avoiding
working at unprotected heights, walking on rocky or uneven surfaces, and exposure to extreme
temperatures, humidity, vibration, dust, odors and fumes — could not perform Plaintiff's past

work, but could perform a limited range of sedentary work and a limited range of light work as a

cashier, production assembler, or electronic assembler.  (*Id.* at 226–27.)  Second, the VE opined

that a person with the above limitations subject to the additional restriction of lifting ten pounds

occasionally and less than ten pounds frequently could perform work as a food and beverage

order clerk.  (*Id.* at 229–32.)  Third, the VE opined that a person with either the first or second

set of hypothetical limitations above, subject to the additional restrictions of sitting, standing, and

walking for no more than thirty minutes at a time totaling four hours out of an eight-hour day

could perform work as a food and beverage order clerk.  (*Id.* at 232.)  Fourth, the VE opined that

a person subject to third set of hypothetical limitations above, with the additional limitations of

occasional twisting and no crouching or crawling could perform work as a food and beverage

order clerk.  (*Id.* at 232.)  Fifth, the VE opined that a person subject to fourth set of hypothetical

limitations above, with the additional restrictions of frequent handling and fingering, and

occasional gripping, grasping, and overhead reaching with the right upper extremity could

perform work as a food and beverage order clerk or a call-out operator.  (*Id.* at 233.)  Finally, the

VE opined that an individual needing to take unscheduled breaks several times a week could

perform work as a food and beverage order clerk or a call-out operator.  (*Id.* at 233–34.)

On June 14, 2004, the ALJ issued his decision, in which he determined that Plaintiff was

not disabled within the meaning of the Social Security Act.  (*Id.* at 15–26.)  The ALJ concluded

that Plaintiff was able to perform modified unskilled sedentary work existing in significant

numbers in the national economy.  (*Id.* at 26.)  In reaching his conclusion, the ALJ found that

Plaintiff had not engaged in substantial gainful activity since May 17, 2001  (*Id.* at 19.)  The ALJ

also determined that Plaintiff had medically determinable, severe impairments in the form of

osteoarthritis of the right knee, degenerative disc disease in the lumbar spine, fibromyalgia, and an affective disorder.  (*Id.*)  The ALJ determined that Plaintiff's impairments, though severe, were not sufficiently severe to meet or equal any of the listings in Appendix 1, Subpart P, Regulations No. 4.  (*Id.*)  Further, the ALJ found that Plaintiff was not fully credible due to the "incongruity between the physical findings in this case and [Plaintiff's] complaints of severe pain and limitations."  (*Id.* at 20, 22.)

> Based on the evidence presented, the ALJ concluded that Plaintiff retained the RFC:
>
> to lift and carry less than ten pounds frequently and ten pounds occasionally.  She could stand and walk [thirty] minutes at one time for four hours out of eight hours and sit [thirty] minutes at one time for four hours out of eight hours with customary morning, lunch, and afternoon breaks.  She could perform frequent handling/fingering and occasional firm gripping/grasping, as required to hold/use a tool with the right hand.  She could also perform work activities requiring occasional driving, balancing, twisting and climbing ramps and stairs.  She would be precluded from performing work activities requiring overhead reaching with the right upper extremity, stooping, kneeling, crouching, crawling, climbing ladders, ropes or scaffolds, working at heights, and walking on rocky/uneven terrain.  The claimant should also avoid concentrated exposure to extreme cold, heat, vibration, fumes, and odors.

(*Id.* at 23.)  The ALJ found that Plaintiff retained the mental residual functional capacity ("MRFC") to "understand, remember, and carry out short and simple instructions that could be learned in [sixty] days."  (*Id.* at 24.)  In keeping with the RFC and MRFC, the ALJ determined that Plaintiff could not perform her past relevant work, but could still successfully perform a significant number of jobs in the national economy.  (*Id.*)  Therefore, the ALJ found that Plaintiff was not disabled.  (*Id.*)

On or about August 2, 2004, Plaintiff requested a review of the ALJ's decision.[4]  (*Id.* at

11, 13.)  On October 6, 2004, the Appeals Council affirmed the ALJ's decision, making it the final

administrative decision for the purposes of judicial review.  (*Id.* at 5.)  On December 9, 2004,

Plaintiff filed a complaint in this court challenging the Commissioner's denial of disability benefits.

(Compl. [filed Dec. 9, 2004].)  On April 18, 2005, Plaintiff filed her opening brief.  (Pl.'s Opening

Br. [filed Apr. 18, 2005] [hereinafter "Pl.'s Br."].)  This matter is fully briefed.

# ANALYSIS

## 1.    *Standard of Review*

Section 405(g) of the Social Security Act establishes the scope of this court's review of

the Commissioner's denial of disability insurance benefits.  *See* 42 U.S.C. § 1383(c)(3)

(incorporating review provisions of 42 U.S.C. § 405[g]).  Section 405(g) provides, in relevant

part, that:

> [t]he findings of the Commissioner of Social Security as to any fact,
> if supported by substantial evidence, shall be conclusive, and where
> a claim has been denied by the Commissioner of Social Security or
> a decision is rendered under subsection (b) of this section which is
> adverse to an individual who was a party to the hearing before the
> Commissioner of Social Security, because of failure of the claimant
> or such individual to submit proof in conformity with any regulation
> prescribed under subsection (a) of this section, the court shall
> review only the question of conformity with such regulations and
> the validity of such regulations.

42 U.S.C. § 405(g).  Thus, this court's review is limited to determining whether the record as a

whole contains substantial evidence supporting the Commissioner's decision.  *See id.*; *Hamilton v.*

---

[4]The record contains two complete and executed Request for Review of Hearing
Decision/Order forms, dated July 15, 2004 and August 2, 2004.  (*Id.*)  A handwritten note on the
July 15, 2004 form states that the form was mailed on August 9, 2004.  (*Id.* at 13.)

*Sec'y of Health & Human Servs.*, 961 F.2d 1495, 1497–98 (10th Cir. 1992).  The court must

uphold the Commissioner's decision if it is supported by substantial evidence.  *See Dollar v.*

*Bowen*, 821 F.2d 530, 532 (10th Cir. 1987).  This court cannot reweigh the evidence, nor may it

substitute its judgment for that of the ALJ.  *Jordan v. Heckler*, 835 F.2d 1314, 1316 (10th Cir.

1987).  That does not mean, however, that my review is merely cursory.  To find that the ALJ's

decision is supported by substantial evidence, the record must include sufficient relevant evidence

that a reasonable person might deem adequate to support the ultimate conclusion.  *Frey v. Bowen*,

816 F.2d 508, 512 (10th Cir. 1987).  A decision is not based on substantial evidence if it is

overwhelmed by other evidence in the record or if there is a mere scintilla of evidence supporting

it.  *Turner v. Heckler*, 754 F.2d 326, 328 (10th Cir. 1985).  The ALJ's decision is also subject to

reversal for application of the wrong legal standard.  *Bernal v. Bowen*, 851 F.2d 297, 299 (10th

Cir. 1988); *Frey*, 816 F.2d at 512.

## 2.    *Evaluation of Disability*

The qualifications for disability insurance benefits under the Social Security Act are that

the claimant meets the insured status requirements, is less than sixty-five years of age, and is

under a "disability."  *Flint v. Sullivan*, 951 F.2d 264, 267 (10th Cir. 1991).  The Social Security

Act defines a disability as an inability "to engage in any substantial gainful activity by reason of

any medically determinable physical or mental impairment which can be expected to result in

death or which has lasted or can be expected to last for a continuous period of not less than

twelve months."  42 U.S.C. § 1382c(a)(3)(A).  In proving her disability, a claimant must make a

*prima facie* showing that she is unable to return to the prior work she has performed.  *Huston v.*

*Bowen*, 838 F.2d 1125, 1132 (10th Cir. 1988).  Once the claimant meets that burden, the

-12-

Commissioner must show that the claimant can do other work activities and that the national economy provides a significant number of jobs which the claimant could perform. *Frey*, 816 F.2d at 512.

The Commissioner has established a five-step process to determine whether a claimant qualifies for disability-insurance benefits. *See* 20 C.F.R. § 404.1520 (2005); *Bowen v. Yuckert*, 482 U.S. 137, 140–42 (1987) (describing five-step analysis). A claimant may be declared disabled or not disabled at any step; and, upon such a determination, the subsequent steps may be disregarded. *See* 20 C.F.R. § 404.1520(a); *Williams v. Bowen*, 844 F.2d 748, 750 (10th Cir. 1988). First, the claimant must demonstrate that she is not currently involved in any substantial gainful activity. 20 C.F.R. § 404.1520(b). Second, the claimant must show a medically severe impairment (or combination of impairments) which limits her physical or mental ability to do basic work activities. *Id.* § 404.1520(c). At the third step, if the impairment matches or is equivalent to established listings, then the claimant is judged conclusively disabled. *Id.* § 404.1520(d). If the claimant's impairments are not equivalent to the listings, the analysis proceeds to the fourth step. At this stage, the claimant must show that the impairment prevents her from performing work she has performed in the past. *See Williams*, 844 F.2d at 751 (citations omitted). If the claimant is able to perform her previous work, she is not disabled. *See* 20 C.F.R. § 404.1520(e); *Williams*, 844 F.2d at 751. If the claimant is unable to perform her previous work, the analysis progresses to the fifth and final step. The fifth step requires the Commissioner to demonstrate that: (1) the claimant has the RFC to perform other work based on the claimant's age, education, past work experience, and (2) there is availability of that type of work in the national economy. *See* 20 C.F.R. § 404.1520(f); *Williams*, 844 F.2d at 751.

### 3.   Disability Determination

Plaintiff sets forth five arguments in support of her contention that the ALJ's decision is erroneous.[5]  Plaintiff argues that the ALJ erred in: (1) assessing Plaintiff's credibility; (2) evaluating Plaintiff's treating physician's medical opinion; (3) assessing Plaintiff's mental residual functional capacity ("MFRC"); (4) finding at step three that Plaintiff's impairments were not sufficiently severe to meet the criteria of Listing 1.04C; and (5) assessing at step five the type and availability of work that Plaintiff could perform.  (Pl.'s Br. at 10–20.)

### a.   Plaintiff's Credibility

The ALJ found that "[Plaintiff's] testimony regarding the severity of her symptoms, including pain, [was] not fully credible."  (Admin. R. at 21.)  Plaintiff argues that the ALJ erred in finding Plaintiff less than fully credible and gave inadequate consideration to Plaintiff's testimony and subjective complaints regarding pain, fatigue, and disability.[6]  (Pl.'s Br. at 10–13.)  "'Credibility is the province of the ALJ.'"  *Musgrave v. Sullivan*, 966 F.2d 1371, 1376 (10th Cir. 1992) (quoting *Brown v. Bowen*, 801 F.2d 361, 362–63 [10th Cir. 1986]).  Credibility determinations made by an ALJ "should not be upset if supported by substantial evidence."  *White*

---

[5] In the interest of clarity, I have altered the sequential order of Plaintiff's substantive arguments.

[6] Plaintiff also argues that the ALJ erred in assessing Plaintiff's credibility by misstating the reason Plaintiff left her previous employment as a graphic designer.  (Pl.'s Br. at 11–12.)  The ALJ stated that Plaintiff left her employment because "the plant where she was working as a graphic designer closed."  (Admin. R. at 22.)  Plaintiff testified that the company where she worked as a machinist closed, and stated she left her employment as a graphic designer because it was too strenuous.  (Admin. R. at 79–80, 213.)  As will be shown, the ALJ's credibility determination is supported by substantial evidence independent of consideration of the circumstances surrounding termination of Plaintiff's employment.  Accordingly, I deem the ALJ's misstatement to be harmless error.  *See Glass v. Shalala*, 43 F.3d at 1396–97.

*v. Barnhart*, 287 F.3d 903, 910 (10th Cir. 2001).  Here, the ALJ's determination is supported by substantial evidence.

The ALJ emphasized that objective clinical findings in Plaintiff's case were "minimal," and the first relevant medical evidence in the record dates from more than a year after Plaintiff's May 2001 onset date.  (Admin. R. at 21, 124–25.)  It is well-established that an ALJ may consider the nature and frequency of treatment sought when assessing the intensity of a claimant's pain symptoms.  *Luna v. Bowen*, 834 F.2d 165–66 (10th Cir. 1987).  This prong of the ALJ's credibility determination is therefore proper and supported by substantial evidence.

The ALJ also found "incongruity" between Plaintiff's complaints of severe pain and limitations and: (1) the physical findings in the instant case, and (2) Plaintiff's testimony.  (Admin. R. at 22.)  In assessing credibility, the ALJ may consider factors including the frequency of medical contacts, extensiveness of attempts to obtain relief, subjective measures of credibility, and the consistency and compatibility of the nonmedical evidence with the medical.  *Fessler v. Apfel*, 11 F. Supp. 2d 1244, 1247 (D. Colo. 1988).  First, the ALJ determined that objective medical evidence contradicts Plaintiff's claims.  (Admin. R. at 22.)  In particular, the ALJ noted that: (1) the March 27, 2003 MRI of Plaintiff's lumbar spine was normal; (2) on February 5, 2003, Dr. Weingarten reported an unknown etiology of Plaintiff's complaints of pain; and (3) the record shows that Plaintiff had a full range of motion of the cervical spine, and no focal abnormalities.  (*Id.* at 22, 125, 129, 163.)  Moreover, in February 2003, X-rays of Plaintiff's lumbar spine including flexion and extension were normal, and X-rays of Plaintiff's lumbar spine including the pelvis and sacroiliac areas revealed very minimal degenerative changes.  (*Id.* at 125, 131.)  Thus, the ALJ's determination that Plaintiff's complaints were inconsistent with the medical evidence is

supported by substantial evidence.  Second, the ALJ found that Plaintiff's complaints of severe

pain and limitation were inconsistent with nonmedical evidence in the instant case — namely,

Plaintiff's testimony.  (*Id.* at 22.)  Plaintiff testified that she: (1) taught water aerobics classes

lasting forty-five minutes three to four times a week; (2) regularly drove thirty minutes each way

to and from the water aerobics classes; (3) performed Pilates exercises for twenty minutes at a

time at home; and (4) performed all of her own activities of daily living, including cooking,

cleaning, and grocery shopping.  (*Id.* at 22, 198–99, 211–12, 207, 215–16.)  The ALJ emphasized

that despite Plaintiff's testimony that driving exacerbated her pain, Plaintiff drove one and one-

half to two hours without stopping in order to get to the hearing.  (*Id.* at 22, 205.)  The ALJ's

determination that Plaintiff's complaints were inconsistent with nonmedical evidence was

supported by substantial evidence.  Thus, the ALJ did not err in his determination that Plaintiff

was not fully credible or in disregarding Plaintiff's testimony and subjective complaints regarding

pain, fatigue, and disability.

### b.        Plaintiff's Physician's Opinion

The ALJ "decline[d] to accept" the opinion of Plaintiff's treating Physician, Dr. Calabrese,

set forth in a questionnaire regarding Plaintiff's RFC dated June 6, 2003.  (Admin. R. at 22–23.)

Plaintiff argues that the ALJ erred in failing to give controlling weight to Dr. Calabrese's opinion.[7]

(Pl.'s Br. at 6–10.)  An ALJ is required to give controlling weight to a treating physician's

well-supported opinion, so long as it is not inconsistent with other substantial evidence in the

---

[7] Plaintiff's argument essentially asks this court to reweigh the evidence and substitute its judgment for that of the ALJ, neither of which it may do.  *See Jordan*, 835 F.2d at 1316. I underscore that this court's exclusive task is to determine whether the ALJ's decision was supported by substantial evidence.  *Dollar*, 821 F.2d at 532.

record.  *See* 20 C.F.R. § 404.1527(d)(2); *Hamlin v. Barnhart*, 365 F.3d 1208, 1215 (10th Cir.

2004).  Moreover, an ALJ must consider a series of factors in determining the amount of weight

to give any medical opinion, including the degree to which the opinion is supported by relevant

evidence and the opinion's consistency with the record as a whole.  *See* 20 C.F.R. §§

404.1527(d)(2)–(6); *Goatcher v. United States Dep't of Health & Human Servs.*, 52 F.3d 288,

290 (10th Cir. 1995).  Should an ALJ disregard the opinion of a treating physician, the ALJ must

set forth "specific, legitimate reasons."  *Hamlin*, 365 F.3d at 1215.  The ALJ has satisfied this

burden in the instant case.

     Here, the ALJ accorded Dr. Calabrese's opinion little weight due to inconsistency with

medical and nonmedical evidence in the record.  (Admin. R. at 22–23.)  Dr. Calabrese opined that

Plaintiff: (1) could sit for five minutes and stand for ten minutes at a time; (2) would need to take

unscheduled breaks; (3) experienced pain that frequently interfered with her attention and

concentration.  (*Id.* at 153–57.)  The ALJ found that the June 6, 2003 opinion was "not supported

by [Dr. Calabrese's] essentially normal objective clinical findings" and was inconsistent with Dr.

Weingarten's opinion and findings.  (*Id.* at 23.)  A treating physician's opinion may be disregarded

if the conclusions therein are not supported by specific findings.  *See Castellano v. Sec'y of

Health & Human Servs.*, 26 F.3d 1027, 1029 (10th Cir. 1994).  Despite the extreme limitations

listed in her June 6, 2003 opinion, in January 2003, Dr. Calabrese found that Plaintiff had a "good

active range of motion of the lumbar spine" and good, equal strength in her lower extremities.

(*Id.* at 134.)  In February 2003, Dr. Calabrese noted that X-rays of Plaintiff's lumbar spine

including flexion and extension were normal and an MRI scan was "completely normal by report."

(*Id.* at 129, 131.)  Moreover, after examining Plaintiff, Dr. Weingarten opined that Plaintiff was

capable of intermittent sitting and standing for one hour at a time, and lifting, carrying, and handling objects weighing up to ten pounds. (*Id.* at 125.) Thus, the ALJ was supported by substantial evidence in finding that the June 6, 2003 opinion was inconsistent with medical evidence on record.

The ALJ also found that Dr. Calabrese's opinion was inconsistent with Plaintiff's own testimony as to her limitations and abilities. (*Id.* at 23.) Although Dr. Calabrese opined that Plaintiff could sit for only five minutes at a time, Plaintiff testified that she: (1) regularly drove thirty minutes to and from the water aerobics classes she instructed; and (2) had driven one and one-half to two hours without stopping in order to arrive at the hearing. (*Id.* at 155, 205, 207.) The ALJ's determination that Dr. Calabrese's June 6, 2003 opinion was inconsistent with the evidence on the record was supported by substantial evidence. Therefore, the ALJ properly disregarded the opinion on that basis.

### c.    *Plaintiff's MRFC*

The ALJ found that Plaintiff maintained the MRFC "to understand, remember, and carry out short and simple instructions that could be learned within [sixty] days." (Admin. R. at 24.) Plaintiff argues that the ALJ erred in omitting Dr. Leidal's finding that Plaintiff's "ability to maintain employment, adapt to the work environment and tolerate the stressors of the work environment and complete a normal work day [was] moderately impaired" from Plaintiff's MRFC determination. (Pl.'s Br. at 13.) Offering neither legal nor medical authority in support, Plaintiff asserts that "[e]ven a moderate impairment in these areas would seriously preclude a person's ability to perform work on a regular and continuing basis." (*Id.*)

Plaintiff's arguments are unavailing. "The record must demonstrate that the ALJ considered all of the evidence, but an ALJ is not required to discuss every piece of evidence." *Clifton v. Chater*, 79 F.3d 1007–10 (10th Cir. 1996). Moreover, an ALJ retains the exclusive final responsibility to decide a claimant's MRFC. *See* 20 C.F.R. §§ 404.1527, 404.1545(b), 404.1546(c). In the instant case, the ALJ properly considered and expressly discussed Dr. Leidal's findings. (Admin. R. at 24.) Poignantly, another of Dr. Leidal's findings to which the ALJ did not expressly refer in his decision was that Plaintiff's ability to obtain "some kind of productive employment" was not impaired. (*Id.* at 150.) Plaintiff does not argue — and the content of the ALJ's decision does not suggest — that the ALJ did not consider the entirety of Dr. Leidal's findings. Accordingly, I find the ALJ committed no error in assessing Plaintiff's MRFC.

### d.    Listing 1.04C

At step three, the ALJ found that Plaintiff's impairments were not sufficiently severe as to meet or equal Listing 1.04C, which pertains to disorders of the spine. (Admin. R. at 19.) Plaintiff concedes that her impairment does not meet Listing 1.04C, but argues that her impairments are the "functional equivalent" of the listing. (Pl.'s Br. at 20.) Plaintiff argues further that the ALJ's step three determination is inconsistent with the ALJ's findings that Plaintiff "had degenerative disc disease of the lumbar spine and [a] knee impairment, and [was] unable to walk on rocky/uneven terrain." (Pl.'s Br. at 19.) I disagree.

Listing 1.04C requires: (1) a disorder of the spine resulting in compromise of a nerve root or the spinal cord, and (2) lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain

and weakness, and resulting in inability to ambulate effectively.[8]  20 C.F.R. § 404 Subpt. P app. 1 § 1.04C (2005).  Substantial evidence supports the ALJ's finding that Plaintiff did not medically equal the requirements of Listing 1.04C.

For Plaintiff to establish that her impairment is "equivalent to a listed impairment, [Plaintiff] must present medical findings equal in severity to all the criteria for the one most similar listed impairment."  *Sullivan v. Zebley*, 493 U.S. 521, 531 (1990) (citation and internal quotation marks omitted); *see Puckett v. Chater*, 100 F.3d 730, 733 (10th Cir. 1996) (holding that an impairment will be deemed medically equivalent to a listing if the medical findings are at least equal in severity and duration to the listed findings).  Here, none of Plaintiff's physicians has diagnosed her with spinal stenosis.  (Admin. R. at 124–74.)  Plaintiff admits that she has not been diagnosed with the condition.  (Pl.'s Br. at 20.)  Moreover, nothing in the record suggests that Plaintiff could not ambulate effectively.  To the contrary, Plaintiff herself testified that she could walk about one-half mile; Dr. Calabrese opined that Plaintiff could walk one mile; Dr. Leidal found that Plaintiff had a "normal and unencumbered" gait; and Dr. Weingarten found that Plaintiff ambulated "with ease."  (Admin. R. at 124, 147, 156, 206.)  Thus, the evidence on the record fails to establish medical findings equal in severity to the criteria of Listing 1.04C.  Plaintiff also argues that the ALJ's determination is inconsistent with the ALJ's findings regarding Plaintiff's ability to walk on rocky or uneven terrain.  (Pl.'s Br. at 19.)  Plaintiff conflates impairments the ALJ found that Plaintiff had with limitations the ALJ imposed on Plaintiff.  The

---

[8]Pseudoclaudication is limping, lameness, or cramplike pains in the legs resulting from compression of spinal nerves (specifically the cauda equina) by a herniated intervertebral disk, or by some other disorder in the region.  5-PR Attorneys' Dictionary of Medicine 2037 (Matthew Bender 2005).

ALJ found that Plaintiff had severe impairments, including osteoarthritis in the right knee and

degenerative disc disease in the lumbar spine.  (Admin. R. at 19.)  In his RFC determination, the

ALJ stated that Plaintiff "would be precluded from work activities

requiring . . . walking on rocky/uneven surfaces." (*Id.* at 23.)  The ALJ did not find that Plaintiff

was physically unable to walk on rocky or uneven surfaces.  Thus, the ALJ was supported by

substantial evidence, was internally consistent, and did not err at step three in determining that

Plaintiff's impairments did not meet or equal listing 1.04C.

> ### e.      *The ALJ's Step Five Determination*

Plaintiff argues that the ALJ erred at step five in failing: (1) to find that the occupational

base was substantially eroded because of Plaintiff's inability to stoop; and (2) to reconcile

discrepancies among the VE testimony, Plaintiff's RFC and MRFC assessments, and the job

descriptions contained within the Dictionary of Occupational Titles ("DOT").  (Pl.'s Br. at

15–19.)

> ### i.      *Erosion of Occupational Base*

The ALJ included in Plaintiff's RFC a limitation precluding Plaintiff from stooping.

(Admin. R. at 23.)  Plaintiff argues that the ALJ's proscription against stooping should have

resulted in a finding that the occupational base for sedentary work was sufficiently eroded to

declare Plaintiff disabled.  (Pl.'s Br. at 18–19.)  Plaintiff accurately cites Social Security Ruling

96-9p for the proposition that "[a] complete inability to stoop would significantly erode the

unskilled sedentary occupational base and a finding that the individual is disabled would usually

apply."  SSR 96-9p, 1996 WL 374185 at * 8 (July 2, 1996).  Plaintiff's argument is ultimately

unavailing.  Although her citation is accurate, Plaintiff's interpretation misses the mark.  Ruling

96-9p expressly states that a finding of disability would "usually" apply. *Id.* Contrary to Plaintiff's argument, the term "usually" does not convey a requirement or a mandate, but instead suggests a trend. Moreover, Plaintiff fails to cite the sentence that directly follows the citation above: "[c]onsultation with a vocational resource may be particularly useful for cases where the individual is limited to less than occasional stooping." *Id.* In the instant case, the ALJ complied with Ruling 96-9p by eliciting testimony from the VE at the hearing. (Admin. R. at 223–36.)

In support of her contention that prohibition of stooping requires a finding of disability, Plaintiff also cites the inapposite *Tyson v. Apfel*, 107 F. Supp.2d 1267 (D. Colo. 2000). In *Tyson*, the ALJ ignored a physician's suggested restriction on stooping for the claimant, who had undergone back surgery in connection with his impairment. *Tyson*, 107 F. Supp.2d at 1269. In the instant case, Plaintiff has undergone only conservative treatment for her impairment, and the ALJ posed hypothetical inquiries to the VE regarding an individual prohibited from stooping and ultimately imposed a stooping limitation in Plaintiff's RFC assessment. (Admin. R. at 23, 232.) The ALJ properly considered Plaintiff's stooping limitation and properly posed hypothetical inquiries to the VE in keeping with Social Security Ruling 96-9p. Therefore, I find that the ALJ did not err at step five in evaluating Plaintiff's available occupational base.

### ii.  *Reconciliation of Discrepancies*

In formulating his decision, the ALJ relied on the VE's testimony that Plaintiff could perform work as a food and beverage order clerk or a call-out operator.  (*Id.* at 24, 226–34.) Plaintiff argues that the ALJ erred at step five in failing to resolve inconsistencies between the VE's testimony as to the work Plaintiff could perform and: (1) the overhead reaching limitation included in Plaintiff's RFC, and (2) the reasoning limitation contained in Plaintiff's MRFC.  (Pl.'s Br. at 15–19.)

With respect to overhead reaching, the ALJ posed a hypothetical inquiry to the VE involving an individual limited to occasional overhead reaching, but imposed a complete proscription against overhead reaching in Plaintiff's RFC assessment.  (Admin. R. at 12, 233.) This discrepancy is crucial for two reasons.  First, it is unclear how much, if any, overhead reaching is required for either of the jobs the VE testified that Plaintiff could perform.  *See* Dictionary of Occupational Titles §§ 209.567-014, 237.367-014.  Second, more importantly, the VE's testimony as to the jobs Plaintiff could perform might have been different had the hypothetical inquiry involved an individual precluded from overhead reaching.  "'Testimony elicited by hypothetical questions that do not relate with precision all of a claimant's impairments cannot constitute substantial evidence to support the [Commissioner's] decision.'"  *Hargis v. Sullivan*, 945 F.2d 1482, 1492 (10th Cir. 1991) (quoting *Ekeland v. Bowen*, 899 F.2d 719, 724 [8th Cir. 1990]).  The VE's responses to the ALJ's hypothetical inquiries involving an individual with limitations different than Plaintiff's cannot serve as substantial evidence to support the ALJ's decision.  Accordingly, I reverse this portion of the ALJ's decision and remand to allow the ALJ to address and rectify the inconsistency between Plaintiff's RFC limitation of no overhead

reaching with the right upper extremity and the hypothetical inquiry posed to the VE involving an individual limited to occasional overhead reaching.

Regarding reasoning level, the ALJ found that Plaintiff had the MRFC "to understand, remember, and carry out short and simple instructions that could be learned within [sixty] days." (Admin. R. at 24.) Plaintiff argues that her MRFC assessment is incompatible with the jobs the VE testified Plaintiff could perform, because of the reasoning level required to perform the jobs. (Pl.'s Br. at 16.) Under the DOT, the food and beverage order clerk and call-out operator jobs both require a reasoning level of three. *See* Dictionary of Occupational Titles §§ 209.567-014, 237.367-014. The DOT defines reasoning level three as requiring the ability to "apply commensense understanding to carry out instructions furnished in written, oral, or diagrammatic form." Dictionary of Occupational Titles § 979.687-034. The DOT defines reasoning level one as requiring the ability to "apply commonsense understanding to carry out simple one- or two-step instructions." Dictionary of Occupational Titles § 979.687-034. Reasoning level one is the only definition containing a reference to "simple" instructions, and appears to be more consistent with Plaintiff's MRFC. *See* Dictionary of Occupational Titles § 979.687-034. In light of the reasoning level one definition, the demands of reasoning level three appear incongruent with the limitation to short and simple instructions imposed in Plaintiff's MRFC. *See Lucy v. Chater*, 113 F.3d 905, 909 (8th Cir. 1997) (holding a claimant limited to following simple instructions could not perform a full range of sedentary work, because many of the jobs required a reasoning level of two or higher); *Hackett v. Barnhart*, 395 F.3d 1168, 1176 (10th Cir. 2005) (holding limitation to simple and routine work tasks is inconsistent with reasoning level three demands). Accordingly, I reverse this portion of the ALJ's decision and remand in order to allow the ALJ to address and

-24-

reconcile the discrepancy between Plaintiff's MRFC limitation to perform short and simple tasks and the reasoning level of three required by the jobs identified by the VE as appropriate for Plaintiff.

**4.      *Conclusion***

Based on the foregoing, it is therefore ORDERED that the Commissioner's decision is AFFIRMED in part, REVERSED in part, and REMANDED for proceedings consistent with this opinion.

I remand this case to the Commissioner for the purpose of reconciling the apparent conflicts among the VE's testimony, the DOT, and Plaintiff's RFC and MRFC.  All other aspects of the Commissioner's decision are affirmed in relevant part.

Dated this 20th day of January, 2006.

BY THE COURT:

s/ Edward W. Nottingham
EDWARD W. NOTTINGHAM
United States District Judge